UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DR. HERNAN MELGAREJO,

                      Plaintiff,

    -v-                                          12 Civ. 6669 (KBF)

NEW YORK COLLEGE OF PODIATRIC            OPINION & ORDER
MEDICINE, et al.,

                      Defendants.
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      On August 31, 2012, plaintiff Dr. Hernan Melgarejo ("plaintiff"), proceeding pro se, filed this action against defendants the New York College of Podiatric Medicine ("NYCPM"), Dr. Kevin Jules ("Jules"), Dr. Robert Eckles ("Eckles"), and Dr. Laurence J. Lowy ("Lowy") (collectively, "defendants"), alleging that defendants discriminated against plaintiff while he was a student at NYCPM. (ECF No. 2.) Plaintiff alleges that defendants – in particular NYCPM and Jules – "racially profiled" plaintiff and in doing so, prevented him from the opportunity to obtain a podiatric residency. (Second Amended Compl. ("Compl.") at 3, Nov. 4, 2013, ECF No. 20.[1])

      On September 9, 2013, plaintiff filed an amended Complaint, and on October 28, 2013, an initial pretrial conference occurred. (ECF No. 19.) On November 4, 2013, plaintiff filed a second amended Complaint (ECF No. 20), and on January 9, 2014, defendants filed a motion for summary judgment (ECF No. 30). Despite being

---

[1] The Court has added page numbers to the Complaint for ease of reference.

given multiple extensions of time (ECF Nos. 37, 39, 43), plaintiff failed to submit an opposition to defendants' motion – though plaintiff did submit a variety of other materials. (ECF Nos. 38, 40, 41, 42, 44.) On March 11, 2014, defendants filed papers in reply. (ECF Nos. 45, 46.)

For the reasons set forth below, the Court hereby GRANTS defendants' motion for summary judgment.

I.  FACTUAL BACKGROUND

The facts below are either undisputed or viewed in the light most favorable to plaintiff. Plaintiff's submissions are read liberally because he is proceeding pro se.

In 2006, plaintiff, who is of Hispanic origin, enrolled as a student at NYCPM. (Statement Pursuant to Local Rule 56.1 ("SOF") ¶ 1, Jan. 9, 2014, ECF No. 35.) The NYCPM is a full-time, four-year program, but with provisions made for students to complete the program in up to six years. (Id. ¶ 3.)

To receive a license to practice podiatry, New York State imposes the following requirements: (1) graduate with a Podiatric Medical Degree; (2) successfully complete a post-graduate podiatric residency; and (3) pass Parts I, II, and III of the American Podiatric Medical Licensing Examinations ("APMLE" or "Boards"), which are administered independently of defendants by the National Board of Podiatric Medical Examiners. (Id. ¶¶ 7-9.)[2]

---

[2] As of July 1, 2011, a passing score on Part II became a prerequisite to a podiatric residence under the standards of the Council on Podiatric Medical Education and New York State Education Department. (SOF ¶ 17.)

2

On July 9, 2008, plaintiff passed Part I of the Boards. (Id. ¶ 12.) Plaintiff has attempted to pass Part II of the Boards on eight occasions; he has not yet passed Part II. (Id. ¶¶ 15-16; Jeffrey A. Kehl Reply Affidavit in Support of Motion for Summary Judgment ("Kehl Reply Aff.") ¶ 5, Mar. 11, 2014, ECF No. 45; 2/24 Ltr., Feb. 24, 2014, ECF No. 41.) According to plaintiff, defendants failed to sufficiently prepare plaintiff for the exam because he is Hispanic. (Compl. at 5; 3/7 Ltr. at 1, Mar. 7, 2014, ECF No. 44.)

Plaintiff alleges that while a student at NYCPM, he witnessed a number of minority students being "forced out" by NYCPM; plaintiff contends NYCPM did not force out any white, Jewish students. (Compl. at 4.)

Between plaintiff's second and third years at NYCPM, plaintiff alleges that a NYCPM clinician, Dr. Khan, told plaintiff and another Hispanic student to "be careful" of defendant Jules because "if he likes you, you will pass [and] if he does not[,] you will not." (Compl. at 4.) Plaintiff later understood this to suggest that Jules discriminated against students of Hispanic origin. (Id.)

In late September 2009, plaintiff contends he was advised – with only three days' notice – that he needed to take his senior surgery exam. (Id. at 5.) Plaintiff states that he requested but was denied additional time to prepare. (Id.) During the oral portion of the exam, plaintiff states that he provided the same answer as a white classmate to one of the questions posed, yet plaintiff scored a one out of 20 while the white classmate allegedly scored 15-17 out of 20. (Id.) Upon learning that he failed both the oral and written portions of the exam, plaintiff immediately

contacted Jules to see what could be done to remedy the issue, but Jules stated that nothing could immediately be done. (Id.)

Plaintiff eventually was given a second opportunity to take his senior surgery exam, but again failed. (SOF ¶ 34.) NYCPM protocol does not permit a student to repeat a failed course more than once without an appeal to the Committee on Academic Performance and Promotions ("CAPP"). (Id. ¶ 36.) Plaintiff appealed his failing grade to CAPP and was granted permission to retake the course in the summer of 2010. (Id. ¶ 37.)[3]

In the middle of plaintiff's summer senior surgery course, plaintiff requested to be withdrawn from the July rotation because he "was not feeling well and had to fly to Florida for [a] residency interview." (Compl. at 6.) While the record is not entirely clear on this point, it appears that Eckles refused to grant plaintiff's request – which plaintiff contends is because "[a]ll he [Eckles] cared about was having a body, [at] no labor cost, to cover the[] rotation" – but plaintiff skipped work and went to Florida anyway. (Id.)[4] Plaintiff nonetheless ultimately passed the course and received his degree in September 2010. (SOF ¶ 39.) Although plaintiff contends that his coursework justified a "B" letter grade, his transcript states that

---

[3] Defendants nonetheless allowed plaintiff to participate in graduation in May 2010. (SOF ¶ 39.)

[4] The Florida residency program initially offered plaintiff a position, but upon learning that he had not yet passed his senior surgery course or graduated, the offer was withdrawn. (Compl. at 6.) While plaintiff was allowed to re-interview for the position the following year, plaintiff states that "their attitude and treatment towards [plaintiff] was totally different," as if NYCPM "had given [plaintiff] a bad review or recommendation." (Id.)

4

he earned a "C-" because of a NYCPM policy regarding grading for repeated courses. (Compl. at 6.)

In addition to these allegations, plaintiff references a handful of other negative experiences he had with defendants during and after his time as a student at NYCPM. While for the most part plaintiff makes no clear suggestion that these experiences occurred because plaintiff is Hispanic, the Court construes plaintiff's inclusion of the allegations as itself suggestive of such contention.

First, during plaintiff's third and fourth years at NYCPM, plaintiff was denied a letter of recommendation by a doctor who previously had agreed to provide him such a letter. (Id.) On August 7, 2009, plaintiff received an email from defendant Lowy expressing concern about plaintiff's clinical abilities. (Id.) Plaintiff presumably believes these occurrences happened because plaintiff is Hispanic.

Additionally, on September 25, 2009, Jules allegedly cold-called plaintiff – which plaintiff contends is not an ordinary practice – and made him feel embarrassed when he did not know the answer to the question posed. (Id.) Similarly, during a presentation by plaintiff on October 1 or 2, 2009, Jules again asked plaintiff a question in front of the class. (Id.) When plaintiff gave the wrong answer, Jules allegedly "looked at [plaintiff] . . . with disgust." (Id.) Here again, while plaintiff does not explicitly state that he believes he received this treatment because he is Hispanic. The Court assumes this is his assertion based on its

5

inclusion in his Complaint.[5]  Plaintiff notes that a white, Jewish classmate commented, "Why do they treat you this way?"  (3/7 Ltr. at 1.)

Plaintiff contends that as a result of the discrimination he suffered, he has been unable to secure a residency or obtain a permanent podiatrist position. (Compl. at 3.)  He claims to have incurred damages in lost time and potential earnings, and that he has been unable to secure any form of employment.  (Id.) Plaintiff seeks $10 million in damages; he also requests that the Court Order he be "grandfathered" into a residency program and be paid additional damages for pain and suffering.  (Pl.'s 3/7 Ltr. at 1.)

## II.   PROCEDURAL HISTORY

Plaintiff initiated this action on August 31, 2012.  (ECF No. 2.)  On September 14, 2012, the matter was assigned to The Honorable Thomas P. Griesa (ECF No. 4), and on June 6, 2013, it was reassigned to the undersigned (ECF No. 8).

On September 9, 2013, plaintiff submitted an amended Complaint, and on September 13, 2013, the Court issued an Order warning plaintiff that it was considering sua sponte dismissing his case for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No. 12.)  The Court Ordered plaintiff to submit a letter explaining why his Complaint should not be sua sponte dismissed.  (ECF No. 12.)  Plaintiff failed to comply with the Court's Order.

---

[5] As another example, plaintiff states that at some point that year, plaintiff received a call for a residency interview, but was unable to return the program's call until later in the day because he was seeing patients. (Compl. at 5.)  Plaintiff alleges that by the time he called the program back, it was too late to interview.  (Id.)

On October 28, 2013, the Court held an initial pretrial conference. (ECF No. 19.) At that conference, the Court explained the requirements of Rule 12(b)(6) to plaintiff. (Tr. 3.) The Court gave plaintiff an opportunity to explain his claim, and provided plaintiff leave to file a second amended Complaint. (Tr. 12.) The Court urged plaintiff to be as detailed as possible in the next version of his Complaint. (Tr. 12.) Counsel for defendants then notified the Court and plaintiff that it planned on submitting a motion for summary judgment in response to plaintiff's second amended Complaint. (Tr. 14.) The Court had counsel give plaintiff a preview of the intended arguments. (Tr. 14-16.) The Court then warned plaintiff that a possible outcome of a motion by defendants was dismissal of plaintiff's case. (Tr. 18.) Before concluding the conference, the Court set a briefing schedule. (Tr. 18.)

On January 9, 2014, defendants filed their motion for summary judgment. (ECF No. 30.) Defendants also filed a notice pursuant to Local Rule 56.2 that explained to plaintiff the ramifications of not responding to the motion. (ECF No. 35.) On January 13, 2014, the Court issued an Order setting forth an updated briefing schedule. (ECF No. 37.)

On January 22, 2014, plaintiff submitted a document entitled "Affirmation in Opposition to Motion to Dismiss." (ECF No. 38.) The Court endorsed the filing by granting plaintiff an extension until February 24, 2014 to properly oppose defendants' motion for summary judgment. (ECF No. 39.)

7

On February 24, 2014, plaintiff submitted three letters to the Court. (ECF Nos. 40, 41, 42.) The first letter inquires whether it would be possible to subpoena certain students and former students of NYCPM. (ECF No. 40.)[6] The second letter reiterates plaintiff's allegations, provides an update regarding plaintiff's attempts to pass Part II of the Boards, and requests that he be grandfathered into a residency program. (ECF No. 41.)[7] The third letter responds to the statistics put forth by defendants regarding the racial/ethnic composition of the Class of 2010. (ECF No. 42.)

On February 26, 2014, the Court Ordered plaintiff to respond to defendants' motion no later than March 7, 2014. (ECF No. 43.) The Court warned plaintiff that if he failed to respond by that date, the motion would be deemed unopposed.

On March 7, 2014, plaintiff submitted an additional letter, again articulating his request for monetary damages and placement in a residency program. (ECF No. 44.) The letter also reiterates plaintiff's allegations and requests that he be appointed a pro bono attorney.[8] (ECF No. 44.) On March 11, 2014, defendants submitted papers in reply. (ECF Nos. 45-46.)

---

[6] This request is denied. Even were plaintiff to have obtained the subpoenas he sought, there nonetheless would be insufficient evidence in the record to survive summary judgment.

[7] The rule regarding passage of Part II of the Boards as a prerequisite for obtaining a residency was passed after plaintiff graduated from NYCPM. The rule was imposed by the Council on Podiatric Medical Education and the New York State Department of Education, not defendants. (SOF ¶ 17.)

[8] Plaintiff's request for a pro bono attorney is denied because plaintiff has not demonstrated that his claim has substance or a likelihood of success. See Hodge v. Police Officers, 802 F.2d 58, 60-61 (2d Cir. 1986); see also Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989) (per curiam).

8

III. STANDARD OF REVIEW

Summary judgment may not be granted unless all of the submissions on such a motion, taken together, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether that party has met its burden, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court is not to act as a trier of fact or to weigh the evidence. Wevant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

In reviewing a motion for summary judgment involving a nonmoving, pro se plaintiff, the Court "liberally construe[s][the] pleadings and briefs submitted by [the] pro se litigant[ ]," "reading such submissions to raise the strongest arguments they suggest." Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) (quotation marks omitted). However, even a pro se plaintiff must offer some evidence that would defeat a motion for summary judgment. Saldana v. Local 32B–32J Serv. Emps. Int'l Union, No. 03 Civ. 1853, 2005 WL 66895, at *2 (S.D.N.Y. 2005) ("Even a pro se plaintiff [ ] cannot withstand a motion for summary judgment by relying merely on the allegations of a Complaint.")

Where, as here, a non-moving pro se party has failed to properly oppose a motion for summary judgment, the Court may grant summary judgment "if the

facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law,'" as long as the pro se party was providing with sufficient notice of the consequences of failing to respond. Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)); see also Jova v. Smith, 582 F.3d 410, 414 (2d Cir. 2009) ("The failure to give adequate notice to a pro se litigant of the consequences of not responding adequately to a summary judgment motion will usually constitute grounds for vacatur.") (citing Sawyer v. American Fed. of Gov't Emps., AFL-CIO, 180 F.3d 31, 34-35 (2d Cir. 1999)).

IV.   DISCUSSION

As a threshold matter, plaintiff has received sufficient warning about the nature of summary judgment and the possible ramifications of his failure to properly respond. First, the Court warned plaintiff at the initial conference that a possible ramification of defendants' motion would be dismissal of the case. (See Tr. at 18.) Additionally, defendants served plaintiff with a Notice Pursuant to Local Civil Rule 56.2 that includes a warning in bolded, capitalized letters that should plaintiff fail to respond to plaintiff's motion, his claims may be dismissed without a trial. (See ECF No. 34.) This notice is sufficient to put plaintiff on notice of the ramifications of a failure to respond. See Vital v. Interfaith Medical Ctr., 168 F.3d 615, 621 (2d Cir. 1999) (explaining that "we have recognized that a District Court

10

need not advise a pro se litigant as to the nature of summary judgment where an opposing party has already provided the litigant with the requisite notice").[9]

Regarding the merits of plaintiff's case, plaintiff alleges that he was discriminated against and racially profiled on the basis of his national origin. Title VI provides, in relevant part, that "[n]o person in the United States shall, on the ground of . . . national origin[] be . . . subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

When deciding motions for summary judgment in national origin discrimination cases such as that at issue here, courts apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Pursuant to McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination. If plaintiff is able to make out such a case, the burden then shifts to defendants to put forth a legitimate, nondiscriminatory reason for the plaintiff's actions. If defendants do so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that defendants' proffered rationale is a pretext.

In order for plaintiff to make out his initial prima facie case, he can either put forth direct evidence or in the absence of such evidence, can rely on indirect evidence by demonstrating that: "(1) [he] is a member of a protected class; (2) [he] suffered an adverse action in pursuit of [his] education by defendant[s]; (3) [he] was

---

[9] Nonetheless, in an effort to construe plaintiff's filings liberally, the Court accepts plaintiff's submissions that came subsequent to the filing of the motion as plaintiff's opposition. The Court also overlooks the fact that they are not sworn under the penalty of perjury.

11

treated differently from similarly situated students who are not members of the protected class; and (4) [he] was qualified to continue in [his] educational pursuit." Koumantaros v. City Univ. of N.Y., No. 03 Civ. 10170, 2007 WL 840115, at *8 (S.D.N.Y. Mar. 19, 2007) (Lynch, J.) (citation omitted).

Plaintiff has failed to put forth either direct evidence of discrimination or indirect evidence sufficient to make out a prima facie case of discrimination.

Plaintiff is a member of a protected class and indisputably had a number of difficulties with regard to his education. He received poor grades (SOF ¶¶ 26-28), was put on academic probation (id. ¶ 27), and allegedly encountered public displays of disapproval (Compl. at 4-5). He failed his senior surgery course and Part II of the Boards (though defendants' only connection to the Boards is that they are in the position to prepare plaintiff for it; they do not administer or grade the exam). Plaintiff did not graduate on time and has been unable to obtain a residency.

Despite this, plaintiff's contentions fails as a matter of law. There is no evidence providing the slightest support for an inference that defendants discriminated against plaintiff based on his national origin or that he was treated differently from his non-Hispanic peers. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."). For instance, plaintiff does not allege – let alone provide factual evidence – that he was provided fewer academic opportunities or given less robust academic support than his non-Hispanic peers. See, e.g., Koumantaros, 2007 WL 840115, at *8. While plaintiff

12

clearly feels he ought to have received more from defendants, such belief is not the same as being treated differently because of national origin.

Plaintiff's one specific allegation that a white student received preferential treatment over him – he contends that he gave the same answer as a white student in the oral examination yet received a far lower grade – is by itself insufficient to create a question of fact on this point. Indeed, setting aside whether the allegation is true, the evidence illustrates that plaintiff also failed the written portion of the exam (twice), for which there is no allegation of biased grading.[10] Plaintiff's vague allegations that he was embarrassed in class and told that "Jules will pass you only if he likes you" do not contain an implication of differential treatment between plaintiff and his non-Hispanic peers.

As for plaintiff's claim that he was not sufficiently supported by defendants in his efforts to improve his academic standing and obtain a residency, plaintiff produces no evidence – indeed, he does not even allege – that non-Hispanic students were given with more academic support than he was. Moreover, the emails attached both to the second amended Complaint and defendants' papers illustrate that plaintiff received a great deal of individualized support and attention throughout his time as a student at NYCPM.

---

[10] The professor who administered the oral exam, defendant Jules, submitted an affidavit swearing that he grades answers to the oral exam "based upon the accuracy of the answer and the clarity with which it is presented," rather than based on race or ethnicity. (Kevin T. Jules Reply Affidavit in Support of Motion for Summary Judgment ("Jules Aff.") ¶ 6, Mar. 11, 2014, ECF No. 46.)

The insufficiency of plaintiff's factual contentions are particularly evident against the backdrop of the uncontroverted statistical evidence provided by defendants. The evidence illustrates that Hispanic and other non-white students fared no worse than white students with respect to attrition, graduation, and post-graduate employment rates. (Defs.' Mem. at 3.) Specifically, 123 students matriculated in the Class of 2010 (plaintiff's class). (SOF ¶ 41.) Of that total, 80 students ultimately graduated in 2010. (Id.) Of the 80 graduates, 58.75% were white, 5% were Hispanic, 30% were non-white or foreign, and 6.25% declined to self-identify. (Id. ¶ 42.) Of those who matriculated but did not graduate, 26.5% of white students failed to complete the program, 20% of Hispanic students failed to complete the program, 50% of other non-white or foreign students failed to complete the program, and 28.75% of those who declined to self-identify did not complete the program. (Id. ¶ 43.) Plaintiff is the only student of his graduating class who was unable to secure a residency. (Id. ¶ 25.) These statistics – while not perfect because there were only five Hispanic individuals who started in the Class of 2010, thus distorting the percentages – suggest that individuals of Hispanic origin fared no worse, statistically speaking, than their classmates.

While not addressed at any length by defendants, the Court also notes that plaintiff has failed as a matter of law to show that he was qualified to graduate on time from podiatry school and obtain a residency. Rather, the record is replete with evidence that plaintiff struggled academically and had trouble mastering the required material. Such fact is perhaps most clearly shown by plaintiff's failure to

14

pass Part II of the Boards – an exam neither written nor graded by defendants. (See Reply ¶ 5.)

Accordingly, the Court finds that plaintiff has failed to make out a prima facie case of discrimination. Plaintiff's claim thus fails as a matter of law.

V.  CONCLUSION

For the reasons set forth above, the Court hereby GRANTS defendants' motion for summary judgment. The Clerk of Court is directed to close the motion at ECF No. 30 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            April 28, 2014

_____
KATHERINE B. FORREST
United States District Judge


CC:   Hernan Melgarejo
      7603 1st Avenue
      Apt. A1
      North Bergen, NJ  07047